## Price *v.* The Sontag.

*(District Court, D. New Jersey.   October 10, 1889.)*

**Collision—Vessels at Dock—Negligent Stowing of Anchor.**
   The canal-boat M. and the bark S. were lying at dock securely fastened, with their bows pointing in the same direction. The S. was astern of the M. about 5 feet, and drew 20 feet forward and 19 feet aft. The M. drew 7½ feet. The depth of water in the dock at high-tide was about 21 feet, with a rise and fall of 6 feet. The inshore anchor of the S., weighing 4,000 pounds, with a shank 8 feet long, hung from her port bow, so that the stock was even with, or just above, the surface of the water. The M. was hemmed in by the S. and other boats, and was unable to move in any direction. The dock was full of boats and ice, with the wind blowing off shore. When the tide was half ebb, and the S. aground, the anchor of the S. caught under the bilge of the M. on her starboard stern quarter, and the M. was careened to port and pitched forward. The anchor of the S. was lowered, but not enough to clear the M., as the tide receded, and the fluke penetrated the seam of the M., causing a leak, which sank her in a few hours. *Held*, that the S. was solely to blame, as her anchor was not properly stowed.

In Admiralty.   Libel for damages.
*Hyland & Zabriskie*, for libelant.
*Owens, Gray & Sturges*, for respondent.

WALES, J.   The libelant sues to recover damages alleged to have been sustained by his canal-boat, T. A. McIntyre, by coming in contact with the fluke of the Sontag's anchor on the 15th of February, 1888, under the following circumstances:   Both vessels had been lying for several days in the Standard Oil-Dock, at Bayonne, in the state of New Jersey, with their bows pointing in the same direction, and their port sides securely fastened to the wharf by bow, breast, and stern lines.   The Sontag was astern of the McIntyre, at a distance of not exceeding five feet.   The bark, being loaded nearly to her full capacity, drew 20 feet forward and 19 feet aft.   The canal-boat, having on board 243 tons of coal, drew 7½

feet. The depth of water in the dock at high tide is about 21 feet, with a rise and fall of 6 feet. The inshore anchor of the Sontag, weighing 4,000 pounds, with a shank 8 feet long, hung suspended from her port bow, so that the stock was even with or just above the surface of the water. The two vessels had remained in their respective positions, without injury to either, until the day of the accident. On that day the McIntyre was hemmed in by the Sontag at her stern, and by other boats along-side and ahead of her, and was unable to move in any direction. The dock was full of boats and floating ice, with the wind blowing strong from the north-west and off shore. At about 4 P. M., the tide being half ebb, and the Sontag aground, the captain of the McIntyre discovered that the anchor of the Sontag had caught under the bilge of his boat, on her starboard stern quarter, and that she was careened to port, and pitched forward. He immediately called to the people on the Sontag to lower their anchor, which was done, but not sufficiently to clear the McIntyre as the tide receded; and as a consequence the fluke penetrated a seam of the boat, making a V-shaped fracture, and causing a leak which sank her in a few hours.

The libel charges negligence on the part of the Sontag in leaving her anchor suspended in the manner described, when, according to rule and usage, it should have been carried at cat-head, or hauled in. The answer admits that the injury complained of was caused by the Sontag's anchor, but alleges that she had remained in the same place for several days, with her anchor hanging from the hawse-pipe, without doing any harm, and without complaint or notice to remove it, and that the anchor was promptly lowered on request. The answer also denies the existence of any rule or custom which requires the in-shore anchor of a vessel, moored as the Sontag was, to be catted or hauled in, and claims that the damage was caused primarily by the inattention of the McIntyre's captain to the fastenings of his boat, which were allowed to become loose, and let her sag down on the Sontag's anchor. There is no proof of negligence on the part of the canal-boat. She had taken her berth first, the Sontag coming in afterwards; and, if it was incumbent on either to keep at a proper distance from the other, that duty belonged to the bark, so long as the canal-boat remained stationary. The evidence does not show that there was any material change in the position of the McIntyre. The situation required some vigilance on the part of both vessels. When two vessels, moored at the same wharf, are lying so near to each other as these two were, there will be more or less play on their lines, with the rise and fall of the tide, and consequently some danger of collision; and it is the duty of each so to dispose of its tackle as to avoid injuring the other in case they come together. The Sontag was in fault by failing to perform this duty. The expert testimony proves the general custom and usage to be that vessels moored at wharves or piers, as these were, must have their in-shore anchors catted, and the off-shore ones hauled in on the forecastle. Such also is the rule established by the board of harbor masters of the port of New York, (rule 9.) The custom is founded on sound prudential reasons, for mutual protection in case of collision; and

one purpose of the rule is to prevent just such accidents as the one which happened to the McIntyre; since, if the Sontag's anchor had been catted, the accident could not have occurred. But, independently of local customs or rules, the maritime law requires that vessels, when navigating narrow rivers or coming into docks, should have their hamper properly stowed. *The Palmetto,* 1 Biss. 143; *The Kolon,* 9 Ben. 198, 199. , The conclusion is that the Sontag was solely to blame; and there must be a decree for the libelant, with an order of reference to ascertain the damage.